Chief Judge JOAN BERNARD ARMSTRONG.
LThe defendant-appellant, the Board of Commissioners of the Port of New Orleans (hereinafter “Dock Board”), appeals a personal injury judgment signed on February 28, 2007, in favor the plaintiffs-appellees, John Morelia and his wife, Jewel Morelia, condemning the Dock Board to pay $2,600,000.00 to John Morelia for damages arising out of his injuries, and $50,000 to his wife, Jewel, for loss of consortium. Third-party defendant-appellee, P & O Ports of Louisiana (hereinafter “P & O”), Mr. Morella’s employer[1], was awarded $413,033.90 in satisfaction of its worker’s compensation claim. By amended judgment dated March 23, 2007, it was specified that the amount awarded to P & O is to be taken from the $2,600,000.00 awarded to John Morelia.[2]
John Morelia filed suit against the Dock Board for injuries sustained by him on July 6, 2001, while operating a large lift truck known as a “top-loader” in an open area of the France Road Terminal known as the “marshalling yard.” These | ^premises were leased by his employer, P & O, from the Dock Board. While backing the top-loader, which was owned or leased by P & O (this is not an issue), the plaintiff drove it into a pothole causing the top-loader to lurch, shake, and jolt, resulting in injury to Mr. Morelia.
The thrust of the plaintiffs suit against the Dock Board is that there would have been no pothole had the Dock Board not failed in its duty to maintain and pave the marshalling yard. The Dock Board filed a third-party demand against P & O contending that under the lease with P & O the duty to prevent the pothole was P & O’s responsibility. Therefore, for purposes of this appeal, P & O’s interests are basically aligned with those of the plaintiffs regarding the allocation of fault.
At the outset we note the following uncontested facts:
1. Mr. Morelia was injured.
*268 2. Mr. Morelia was not negligent in any way that contributed to the accident.
3. Mr. Morelia sustained special damages listed in the written reasons for judgment consisting of past lost wages — $385,039.00; past medical expenses — $113,947.35; future surgery costs of $235,000.00 totaling $733,986.35, listed in the written reasons for judgment are contested.
4. Mrs. Morelia has a valid claim for loss of consortium in the amount of $50,000.00.
5. Under La. R.S. 13:5106 B(l) there is a $500,000.00 cap on the amount of general damages that may be assessed against the Dock Board, which sum includes the amount awarded to Mrs. Morelia for loss of consortium.
|36. Any amounts awarded to Mr. Morel-la for future medical expenses are required by La. R.S. 13:5106 to be placed in a reversionary trust.
7. The trial court judgment should be amended to allow post-judgment interest at the prevailing rate pursuant to La. R.S. 13:5112 C. This is the only relief asked for by the plaintiffs in their answer to the appeal.
The following matters are contested in this appeal:
1. Did P & O as Mr. Morelia’s employer have a duty to provide him a safe place in which to work, and if so, how does that duty relate to the pothole?
2. Who was responsible for the pothole, under the lease between P & O and the Dock Board?
3. Can the Dock Board contractually shift responsibility for the pothole to P & O pursuant to La. R.S. 9:3221 even where the Dock Board was aware of the condition of the yard?
4. If we find that the Dock Board is responsible for the pothole, and that P & O breached its duty to provide Mr. Morelia a safe place in which to work, was the trial court manifestly erroneous in assigning all fault to the Dock Board.
5. Where the judgment and reasons for judgment are silent, should the entire $1,866,013.65 balance of the $2,600,000.00 awarded to the plaintiff, after deducting the $733,986.35 designated in the reasons for judgment as special damages, be considered to be general damages.
|46. Can this Court award the plaintiffs more than was awarded by the trial court when the only issue raised in their answer to the appeal concerned legal interest?
However, the crux of the case consists of these two questions:
1. Did the trial court err in assigning all fault to the Dock Board and none to P & O?
2. Where the judgment and reasons for judgment are silent, should the entire $1,866,013.65 balance of the $2,600,000.00 awarded to the plaintiff, after deducting the $733,986.35 designated in the reasons for judgment as special damages, be considered to be general damages?
The main thrust of the Dock Board’s appeal is that, at most, it should have been found only partially at fault, if at all, because P & O violated its duty to provide its employee, John Morelia, a safe place in which to work as required by La. R.S. 23:13 and OSHA, 29 U.S.C. § 654. The thrust of P & O’s counter argument is not that the Dock Board is liable for breach of a duty to provide Mr. Morelia a safe place in which to work. Rather, it is that the *269 Dock Board breached its legal duty as owner of the property for its failure to remedy known defects and that the Dock Board breached its duty under the lease to maintain the premises, specifically regarding the Dock Board’s obligation to remedy defects arising from subsidence and the Dock Board’s obligation to pave the area where the accident occurred within three years of the inception of the lease.
Paragraph 12(B) of the lease requires the Dock Board to “design and have constructed improvements” including the “paving or resurfacing” of the area in | fiwhich the accident occurred. The lease allowed the Dock Board thirty-six months in which to “complete these improvements” (i.e., until November 10, 2001) and the terms of the lease specifically relieved P & O of any obligation to contribute anything towards the cost of such improvements.
Paragraph 19(B) requires of the Dock Board to perform and pay all costs of maintenance and repair of “structural» defect of the improvements on the Leased Premises, including any subsurface settlements not caused by acts, omissions or negligence of Lessee.”
Paragraph 19(A)(ii) authorizes the Dock Board to “perform or have independent contractors perform ... all at Lessee’s cost risk and expense,” any maintenance or repairs that P & O is required but fails to perform under the lease.
The lease commenced on November 10, 1998[3]. Therefore, the lease required the Dock Board to complete its repaving no later than November 10, 2001, thirty-six months later. The Dock Board contends that in the interim potholes were the responsibility of P & O. We find that the trial court was reasonable in looking at the lease in conjunction with the actions of the parties following the confection of the lease* and finding that the lease placed the responsibility for subsidence caused potholes on the Dock Board. Moreover, the thirty-six month time period was a completion deadline, but nothing prevented the Dock Board from commencing work immediately, especially where the record reflects that the Dock Board was aware of the defect and the. extensive amount of subsidence occurring on the leased premises. . As the Dock Board would, of necessity, have to begin the repaving work well in advance of the deadline in order | Rto meet the. deadline, we find that implicit in the agreement to repave is the obligation that the Dock Board commence the work sufficiently in advance of the deadline so as to allow for its timely completion. Therefore, we find that the most reasonable interpretation of Paragraph 12(B) is that it places the responsibility and liability for the surface of the yard on the Dock Board upon the execution of the lease, but recognizes that the Dock Board cannot be expected to complete the work instantly; nor can the Dock Board be considered to be in default under the lease for failure to complete until the three-year period has elapsed. However, the fact that the Dock Board won’t be in default until the three-year period has elapsed does not mean that its responsibility and liability is not immediate.
As the Dock Board does not contest the fact that it had been aware for years of the defective condition of the yard, there is no need to conduct an in depth analysis of the evidence showing this to be the case.
La. R.S. 9:8221 provides that:
*270 Notwithstanding the provisions of Louisiana Civil Code Article 2699, the owner of premises leased under a contract whereby the lessee assumes responsibility for their condition is not liable for injury caused by any defect therein to the lessee or anyone on the premises who derives his right to be thereon from the lessee, unless the owner knew or should have known of the defect or had received notice thereof and failed to remedy it within a reasonable time. [Emphasis added.]
The evidence also supports the conclusion that the Dock Board was aware of its responsibility regarding potholes. The Quarterly Inspection reports of May 5, 1999 and August 10, 1999, note the existence of potholes to be either “resurfaced by the Board” or “repaired by the Board.”
Accordingly, regardless of the lease, in the instant case where the record is clear that the Dock Board was aware of the condition of the defect in the leased 17premises, and did not act in a reasonable time, the Dock Board is legally liable for the known defective condition of the premises.
The Dock Board cites three cases in support of its contention that it owes no duty to P & O employees: Palermo v. Port of New Orleans, 04-1804 (La.App. 4 Cir. 1/19/07), 951 So.2d 425, cert. den., 07-0363 (La.6/13/07), 957 So.2d 1289; Faulkner v. The McCarty Corporation., 02-1337 (La.App. 4 Cir. 6/11/03), 853 So.2d 24 and Harvey v. Board of Commissioners of the Port of New Orleans, 2007-C-1249 (La.App. 4 Cir. 11/02/07) an unpublished writ opinion. These cases were brought by longshoremen for cargo handling asbestos exposure on the wharves of the Mississippi river. In all of these cases this Court reversed district court holdings finding the Dock Board liable. For the Dock Board to be held liable, the plaintiff would have to show negligence under a duty/risk analysis:
The trial court concluded that the Dock Board breached its duty to provide the plaintiffs with a safe workplace. However, plaintiffs cite no statutory or jurisprudential authority, nor have we found any, that imposes on a non-employer, such as the Dock Board, the duty to provide employees with a safe workplace. As the Dock Board points out, both federal and state law unequivocally impose this duty on the stevedore’s employer. See: 29 U.S.C. § 654; La. R.S. 23:13. La. R.S. 23:13 states:
Every employer shall furnish employment which shall be reasonably safe for the employees therein. They shall furnish and use safety devices and safeguards, shall adopt and use methods and processes reasonably adequate to render such employment and the place of employment safe in accordance with the accepted and approved practice in such or similar industry or places of employment considering the normal hazard of such employment, and shall do every other thing reasonably necessary to protect the life, health, safety and welfare of such employees.
[[Image here]]
^Because the Dock Board leased its wharves to the various stevedoring companies who employed Mr. Palermo and Mr. Veal, we must determine whether the Dock Board owed a duty to the plaintiffs as a product of the lessor/lessee relationship between the Dock Board and the plaintiffs’ various employers. [FN13 omitted.] La. R.S. 9:3221 provides:
The owner of premises leased under a contract whereby the lessee assumes responsibility for their condition is not liable for injury caused by any defect therein to the lessee or anyone of the *271 premises who derives his right to be thereon from the lessee, unless the owner knew or should have known of the defect or had received notice thereof and failed to remedy it within a reasonable time.
Therefore, even if a property owner has contracted away his responsibility for maintaining his premises to his lessee, the owner can still be held liable if he knew or should have known of a defect in the property and failed to remedy it within a reasonable time. Faulkner, supra, p. 6; 853 So.2d at 29 (citing Audler v. Board of Comm’rs of the Port of New Orleans, 617 So.2d 73, 77 (La.App. 4th Cir.1993)).
Palermo v. Port of New Orleans, pp. 11-14 (La.App. 4 Cir. 1/19/07), 951 So.2d 425, 435-436. Therefore, as the Dock Board had knowledge of the deteriorated condition of the yard where Mr. Morelia worked, Palermo supports P & O’s position more than it does that of the Dock Board.
In Faulkner, supra, this Court found that the Dock Board had no notice of any defect in the premises. In Harvey, supra, this Court cited and followed both Palermo and Faulkner, finding that the Dock Board had no knowledge of any defect in the premises.
These cases are distinguishable from the instant case, where the Dock Board indisputably had prior knowledge of the defective premises.
In contrast to these three cases, is the case of Audler v. Board of Commissioners of the Port of New Orleans, et al., 617 So.2d 73 (La.App. 9Cir.1993). In Audler this Court reversed a summary judgment exonerating the Dock Board from liability based on a finding that there was an issue of fact as to whether the Dock Board knew of the defective condition of the premises, in which case it could be held liable.
To the point is this Court’s opinion in Ganheart v. Executive House Apartments, 95-1278 (La.App. 4 Cir. 2/15/96), 671 So.2d 525, 530:
Defendant argues that it cannot be responsible for the defective condition of its premises because plaintiff failed to provide written notice of same as per the lease terms and La.R.S. 9:3221. We disagree. A landlord cannot escape its responsibility to repair defects where it had actual notice of those defects, even though the notice is not in writing. Smith v. Jack Dyer and Associates, Inc., 633 So.2d 694 (La.App. 1st Cir.1993). The evidence in the instant case conclusively shows that defendant was well aware of the problems in plaintiffs apartment and failed to correct them. Furthermore, defendant cannot rely on plaintiffs failure to mitigate damages by making her own repairs where defendant consistently made no effort to correct the problems.
From the foregoing, we conclude that the Dock Board cannot shift liability for known defects to P & 0, regardless of what the lease says.
Turning now to the damage awards, we note that although the judgment awarded Mr. Morelia $2,600,000.00, plus $50,000.00 for his wife for loss of consortium, in her reasons for judgment the only portions of the $2,600,000.00 that were broken out by the trial judge and itemized were the following items of special damages:
1. past lost wages — $385,039.00
2. past medical expenses — $113,947.35.
3. future surgery costs of $235,000.00.
|inThe Dock Board does not challenge any of these amounts which total $733,986,351 Neither the judgment nor the reasons for judgment label or explain what type of damages make up the balance of the judgment. Both the Dock Board and P &' O argue that the entire $1,866,013.65 should be assumed to be general damages in spite of the fact that it is not specifically labeled as such. The plain *272 tiffs do not dispute the Dock Board’s assertion that the $500,000.00 cap applies to general damages, including the $50,000.00 awarded for loss of consortium. The plaintiffs contend that the $1,866,013.65 balance of the judgment remaining after deducting those items of special damages specified in the reasons for judgment was not attributable entirely to general damages, but instead consisted of other items of special damages over and above the $500,000.00 maximum amount allowable for general damages sufficient to justify the entire amount awarded by the trial court.
The plaintiffs contend that, based on the report of their expert wage loss projectionist, Harold Asher, Mr. Morelia suffered a loss of future wages and fringe benefits of $1,433,822.00 not subject to the $500,000.00 cap. The plaintiffs also argue that they proved $85,750.00 of future medical damages not included in the $235,000.00 awarded for the cost of future surgery, also not subject to the cap. The plaintiffs ask that this Court amend the judgment to reflect the following:
Past Wage Losses $ 385,039.00
Future Wage Losses $1,433,822.00
Past Medical Expenses $ 113,947.35
General Damages and Loss of Consortium reduced to reflect the Statutory cap $ 500,000.00
111 SUBTOTAL $2,432,808.65
Future Medical Expenses $ 85,750.00
Future Surgery $ 235,000.00
TOTAL $2,753,558.65
We note that neither the Dock Board nor P & O challenge the plaintiffs’ calculation of any of the amounts set forth above. Instead both the Dock Board and P & O restrict their arguments to the contention that the entire $1,866,013.65 balance of the $2,600,000.00 awarded after subtracting the three items of special damages specifically set forth in the judgment should be presumed to be general damages subject to the $500,000.00 cap. As there is support in the record for each of the items of special damages set forth above[4], in the absence of any argument to the contrary, we will accept those amounts as proven as to amount, subject to the defendants’ argument that they were not contemplated by the judgment.
The plaintiffs’ calculation of $2,753,558.65 in damages exceeds the $2,650,000.00 awarded to the plaintiffs in the aggregate. The only issue the plaintiffs raised in their answer to the appeal concerns legal interest which we will address elsewhere in this opinion. Therefore, we will not consider any request by the plaintiffs to increase the $2,650,000.00 amount awarded by the trial court. Samuel v. Baton Rouge General Medical Center, 98-1669 (La.App. 1 Cir. 2/18/00), 757 So.2d 43. Thus, the following analysis will be limited to an examination of the plaintiffs’ entitlement to $2,650,000.00, not $2,753,558.65.
First, we are faced with the difficult question of whether the award by the trial *273 court of certain items of special damages implies a denial of the other items of special damages claimed by the plaintiffs under the maxim that where a matter is described as to particulars, other particulars not mentioned are implicitly excluded, combined with the rule that when a judgment is silent as to a claim it is deemed denied. Loria v. Petunia’s Restaurant, 02-1712, p. 3 (La.App. 4 Cir. 7/9/03), 852 So.2d 510, 512; Bain v. Middleton, 00-2630, p. 1, FN. 2 (La.App. 4 Cir. 11/14/01), 802 So.2d 837, 838; see also Joseph v. Houston, United Automobile Association, 04-350, p. 5 (La.App. 5 Cir. 10/12/04), 886 So.2d 1133, 1136-1137, cited by P & O.
If we treat the $1,866,013.65 balance the same way we would treat a “lump sum” judgment then it is presumed to include all damages claimed, both general and special. Bryan v. City of New Orleans, 98-1263, p. 2 (La.1/20/99), 737 So.2d 696, 697; Reichert v. Bertucci, 96-1213, p. 4 (La.App. 4 Cir. 12/4/96), 684 So.2d 1041, 1044. This Court is unaware of any cases in which amounts have been awarded for certain items of special damages wherein the unspecified balance of the judgment was treated as a lump sum judgment. But this Court has not located any cases holding the contrary.
Moreover, we must assume that the trial court was aware of the cap when it rendered its judgment. All parties to this appeal, including the plaintiffs, acknowledge the applicability of the $500,000.00 cap to this case. Where all parties acknowledge the applicability of the cap, it is only reasonable to assume 11F,that the trial court was aware of it. Therefore, whatever inferences might normally be drawn from the fact that certain items of special damages were mentioned in the judgment while the judgment was silent as to others are overshadowed in this case by the inference that the trial judge was fully aware of the $500,000.00 cap and would not have ignored it. It follows that only $500,000.00 of the judgment can be attributable to general damages, with the result that the balance must be allocated to special damages consistent with the position taken by the plaintiffs. Accordingly, we find that the $1,866,013.65 balance of the judgment should be treated as a “lump sum” consisting of both general and special damages consistent with the calculations suggested above by the plaintiffs, subject to the $2,600,000.00 amount of the judgment in the absence of any appeal or answer to the appeal by the plaintiffs asking to have that amount increased.
Neither the Dock Board nor P & O contest the fact that the plaintiffs sustained sufficient general damages, including the $50,000.00 for loss of consortium, to equal or exceed the $500,000.00 cap.
The next issue to be decided is the Dock Board’s contention that it was error to assign no fault pursuant to La. C.C. art. 2323 to Mr. Morelia’s employer, P & O under the theory that P & O breached its duty to provide its employees a safe place to work. Based on the record, it would be manifest error to find that P & O was unaware of the hazard that resulted in this accident. There are numerous references in P & O’s brief to P & O’s historical knowledge of the poor condition of the yard surface.
Mr. Morelia testified without contradiction that he had personal knowledge of four co-workers who were hurt by hitting potholes while operating a top loader in the marshalling yard prior to his injury. He testified that he complained about 1 uthe condition of the marshalling yard on a daily basis but was told to avoid the potholes as best he could. However, because of the huge size of the top loader machine he operated (he described it as a 150,000 pound machine used to lift and *274 move twenty and forty foot containers), he was unable to see either in front or behind for some twenty to thirty feet.
He testified that someone would fill the potholes with a temporary filling consisting of shells somewhere between semiannually and annually. He did not know who was in charge of filling' the holes. When first asked whether the operations in the yard had anything to do with the formation of the potholes, he testified that he did not know, but when shown his earlier deposition testimony he then testified that, “I would say they had something to do with it; yes, sir.”
Mr. James C. Finley, a P & O vice-president at the time of the accident, but was retired at the time of the trial, was called by the plaintiffs to testify. He worked in the yard since 1980. He testified that the condition of the yard was deplorable and that: “The uneven areas caused by the subsidence, in combination with the heavy nature of the top loaders, constantly caused potholes to develop in the yard.” He testified that from the time he arrived in October of 1980, the condition of the yard became progressively worse.
Mr. Finley testified that subsidence affected the entire yard. He explained that a representative of the Dock Board would accompany a P & 0 representative around the facility observing among other things, the condition of the yard.
On the stand, Mr. Finley read from letters to the Dock Board dated July 22, 1993, November 16, 1993 and April 28, 1999, proving that both the Dock Board and P & 0 had been aware not only of the deplorable condition of the yard that had 1 ^existed for years, but that there had been injuries attributable to that deplorable condition prior to that of Mr. Morelia.
He expressed the opinion that potholes in the marshalling yard were caused by subsidence:
Well, the surface became very uneven, and sinkage was a problem there. There was one building that had an asphalt mark on it that measured about 32, 33 inches from the current level of the yard. That was kind of a benchmark to the sinkage.
To his knowledge all other yards used for this type of operation were paved. But Mr. Finley also acknowledged that the yard was already in deplorable condition at the time the November 1998 lease was executed and that P & 0 was well aware of the condition having leased the premises for some considerable number of years under previous leases to its predecessor acquired corporation, NOMC. The fact that P & 0 argues that it had long complained to the Dock Board about the condition of the yard and the injuries attributable to that condition, is further proof of P & O’s long term knowledge of the dangerous working conditions in the yard.
The plaintiffs called Mr. Gaylord Meeker, Marine Superintendent for P & 0 who testified that he worked at the France Road yard from 1981 on. He said that the yard “was a deteriorating condition since I worked there, and every year it was — it had gotten more pronounced.”
He testified that their equipment, which was handling 30- and 35-ton containers was not designed to be operated on the kind of surface that existed at the yard and that the equipment was getting damaged and the people hurt. He testified further that his warnings to his superiors at P & 0 were more than ignored — they were discouraged.
hfiMr. Meeker testified that he personally observed “a problem with subsidence or sinking ...” He explained that they even had electrical problems because the sink *275 ing would cause the electrical line underground to be severed. :
Mr. Michael Frenzel was qualified by the plaintiffs as an expert Board certified safety professional. He testified that the yard had “an unacceptable level of risk for those being required to work in it — on it.” He specified that operating top loaders in the yard “presented an unacceptable level of injury to workers.” He explained that in spite of the fact that the workers were admonished to do their best to avoid the potholes, as a practical matter it was impossible to do so.
Mr. Paul Zimmerman, a district manager for the Dock Board, testified as a witness for the Dock Board. He acknowledged that the Dock Board had never complained to P & 0 that it was not living up to its repair and maintenance obligations under the lease, if it believed that P & 0 had any such obligation. On the other hand, P & 0 never asked to be reimbursed for the temporary repairs it made to the surface of the yard.
The plaintiffs contend, citing Dufrene v. Insurance Co. of State of Pennsylvania, 01-47 (La.App. 5 Cir. 5/30/01), 790 So.2d 660, that it is against public policy for the Dock Board to transfer any of its liability under La. R.S. 9:3221 to P & O, Mr. Morelia’s tort-immune employer. However, that is not the issue addressed by the Dock Board’s comparative fault argument. In this assignment of error the Dock Board is asking only that this Court apply the principles of comparative negligence pursuant La. C.C. art. 2323, i.e., it is seeking to allocate to P & O only that portion of the fault properly attributable to P & O for failing to provide Mr. Morelia a safe place in which to work. This is different from trying to offload its own negligence on to P & 0. The Dock Board’s argument is Inconsistent with the result reached by the Dufrene court. In Dufrene the court found the lessor 60% at fault, based on a finding that it had notice of the defect in question, an exception to the lessor immunity provided by La.. R.S. 9:3221; and the court found the plaintiffs employer 40% -at fault. Thus, while the Dufrene court states that the lessor may not transfer its own negligence to the tort-immune employer where the lessee’s employee is injured, it does stand for the proposition that the independent comparative fault of the tort-immune employer-lessee should be allocated to it. The Dock Board’s position is consistent with La. C.C. art. 2323 which requires the calculation of the percentage of fault attributable to statutorily immune parties. We must agree.
Thus, in the instant case it really makes little difference what the obligations were under the lease. Where the Dock Board is concerned, it was aware of the condition of the premises for years, but did not act, thereby depriving it of the protections afforded by La. R.S. 9:3221 to the unknowing landlord. Likewise, regardless of P & O’s obligations under the lease, the record admits of only one conclusion: P <& O was long aware that its employees, like Mr. Morelia, worked under unsafe conditions but persisted in doing so nevertheless. Therefore, to allocate no fault to P & O is clearly wrong.
We .are guided by the following precepts in reviewing the trial court’s allocation of fault:
This Court has previously addressed the allocation of fault and the standard of review to be applied by appellate courts reviewing such determinations. Finding the same considerations applicable to the fault allocation process as are applied in quantum assessments, we concluded “the trier of fact is owed some deference in allocating fault” since the finding of percentages of fault is also a *276 factual determination. Clement v. Frey, 95-1119 (La.1/16/96); 666 So.2d 607, 609, 610. As with other | ¶/actual determinations, the trier of fact is vested with much discretion in its allocation of fault. Id. Therefore, an appellate court should only disturb the trier of fact’s allocation of fault when it is clearly wrong or manifestly erroneous. Only after making a determination that the trier of fact’s apportionment of fault is clearly wrong can an appellate court disturb the award, and then only to the extent of lowering it or raising it to the highest or lowest point respectively which is reasonably within the trial court’s discretion. Clement, 666 So.2d at 611; Coco v. Winston Industries, Inc., 341 So.2d 332, 335 (La.1977). [Emphasis added.]
Duncan v. Kansas City Southern Railway Co., 00-0066, pp. 10-11 (La.10/30/00); 773 So.2d 670, 680-681.
Having already determined that the trial court was clearly wrong in its allocation of fault, pursuant to the language of the Supreme Court highlighted in the quotation above from Duncan, we find that the lowest amount of fault that could have been allocated to P & O within the reasonable discretion of the trial court is 25%.
Based on the foregoing, we affirm the judgment of the trial court subject to the modifications and amendments hereinafter set forth:
The judgment amount of $2,600,000.00 plus $50,000.00 for loss of consortium is affirmed. The judgment is amended to provide that post-judgment interest be awarded to the plaintiffs at the prevailing rate pursuant to La. R.S. 13:5112 C. The judgment is further amended to provide that $85,750.00 for future medical expenses and $235,000.00 for future surgery be placed in a reversionary trust pursuant to La. R.S. 13:5106.
[ iaThe judgment is further amended to allocate 25% of the fault to P & O. In all other respects the judgment of the trial court as amended on March 23, 2007, is affirmed.
JUDGMENT AMENDED AND AS AMENDED, AFFIRMED.

. At the time of his injury, Mr. Morelia was employed by New Orleans Marine Contractors (NOMC) which was subsequently merged into P & O. All references to P & O include New Orleans Marine Contractors.

. Much of the prior procedural history of this case is set forth in the prior summary judgment appeal opinion in this matter, Morella v. Board, of Com’rs of Port of New Orleans, 04-0312 (La.App. 4 Cir. 10/27/04), 888 So.2d 321, concerning the Dock Board's third party demand against P & O for defense and indemnity. On June 21, 2005, subsequent to this Court’s appeal opinion, P & O filed a petition of intervention, seeking to recover any amount it had paid to Mr. Morelia out of any potential award made to him against the Dock Board.

. P & O had been leasing the yard for many years prior thereto through its acquired predecessor corporation, NOMC.

. For example: The largest amounts relate to past and future lost wages that are supported by conservative projections, e.g., a work life up to age 62 rather than 65 and very reasonable interest rate assumptions. No one has challenged Mr. Morelia's projected disability or any of the following: general damages of at least $500,000.00 (including loss of consortium) future surgery of $235,000.00 and past medical expenses of $113,947.35. The only item that might be questioned to some extent on a de novo review as being speculative in part would be the $85,750.00 for future medical expenses, and it is irrelevant as it is not needed to arrive at the $2,600,000.00 amount awarded in the judgment, the maximum this Court can affirm on appeal as will be explained in the next paragraph of this opinion. However, we note that the plaintiffs acknowledge that this sum should be included in a reversionary trust pursuant to La. R.S. 13:5106.