# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2013-KA-02110-COA

NATHANIEL HAMPTON A/K/A NATHANIAL HAMPTON          APPELLANT

v.

STATE OF MISSISSIPPI          APPELLEE

| | |
|---|---|
| DATE OF JUDGMENT: | 02/07/2013 |
| TRIAL JUDGE: | HON. BETTY W. SANDERS |
| COURT FROM WHICH APPEALED: | SUNFLOWER COUNTY CIRCUIT COURT |
| ATTORNEYS FOR APPELLANT: | OFFICE OF STATE PUBLIC DEFENDER<br>BY: GEORGE T. HOLMES<br>    BENJAMIN ALLEN SUBER |
| ATTORNEY FOR APPELLEE: | OFFICE OF THE ATTORNEY GENERAL<br>BY: LADONNA C. HOLLAND |
| DISTRICT ATTORNEY: | WILLIE DEWAYNE RICHARDSON |
| NATURE OF THE CASE: | CRIMINAL - FELONY |
| TRIAL COURT DISPOSITION: | CONVICTED OF CAPITAL MURDER AND SENTENCED TO LIFE IN THE CUSTODY OF THE MISSISSIPPI DEPARTMENT OF CORRECTIONS WITHOUT THE POSSIBILITY OF PAROLE |
| DISPOSITION: | AFFIRMED - 04/12/2016 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

**BEFORE GRIFFIS, P.J., CARLTON AND JAMES, JJ.**

**CARLTON, J., FOR THE COURT:**

¶1.     Nathaniel Hampton appeals his conviction of capital murder and sentence of life in the custody of the Mississippi Department of Corrections (MDOC) without the possibility of parole.  Hampton argues (1) that the trial court erred by failing to grant him a mistrial after members of the jury were allowed to see him shackled and behind bars, and (2) that the

evidence is insufficient to support the guilty verdict. Finding no error, we affirm Hampton's conviction and sentence.

**FACTS**

¶2. In June of 2011, the Indianola Police Department arrested Hampton and Gerod Nellum for the murder of David Melton. A grand jury subsequently indicted Hampton for capital murder on December 29, 2011. The indictment specifically charged that

> [Hampton and Nellum], while acting in concert with and/or aiding, abetting, assisting, or encouraging each other or others, did willfully, feloniously, and of . . . malice aforethought, kill and murder one, David Melton, a human being, at a time when [Hampton and Nellum] were engaged in the crime of robbery by unlawfully, willfully and feloniously making an assault upon David Melton, then and there, by violence to the person of David Melton or by putting David Melton in fear of some injury to his person, and from the presence or from the person and against the will of David Melton, did intentionally and feloniously steal, rob, seize, take and carry away of the total and aggregate value of one dollar or more of the property.

¶3. At a trial held on May 27, 2014, Richard O'Neal testified that he was at Hampton's home on June 30, 2011, and the two men left and walked to Hannah Street, where they met up with Marcus Haney. O'Neal, Hampton, and Haney then went back to Hampton's home and stayed there for approximately thirty minutes. When they left there, they walked back down Hannah Street, where the men saw Nellum and Melton. O'Neal testified that Nellum informed them that he was "fixing to whoop Dude, Dude owed him $120," referring to Melton. Hampton responded and said, "What's up? Let's go." O'Neal testified that he told the men, "Y'all do what y'all do." He observed Hampton start running towards Melton, and then watched as Hampton took the padlock that he was wearing around his neck on a shoestring and handed it to Nellum. Nellum "put [the padlock and shoestring] on his hand"

2

and jogged towards Melton. O'Neal recounted that once Nellum caught up to Melton, Nellum asked, "You ain't going to pay my money?" and hit him with the padlock. O'Neal testified that after Nellum hit him, Melton "was laid out" on the street. Nellum continued to hit Melton. O'Neal testified that while Nellum hit Melton, Hampton called out to Nellum and said "that's enough." Hampton then "went in [Melton's] pocket, got his wallet, went through it . . . and just throwed [sic] it back."

¶4. O'Neal testified that he, Nellum, and Hampton then left, walking through the park on Hannah Street. O'Neal stated that he pointed out to Hampton that Hampton had blood on his t-shirt, and Hampton then removed his t-shirt and threw it in the park.

¶5. Haney testified to similar facts at trial. Haney stated that on June 30, 2011, he was walking on Hannah Street in Indianola, Mississippi, with O'Neal and Hampton. Haney testified that the three men ran into Nellum, who then joined them on their walk. Nellum informed the group that a "dude owed him some money." According to Haney, Hampton then handed Nellum a padlock. Haney testified that the man who Nellum claimed owed him money, Melton, walked past the group. Haney watched Nellum hit Melton with the padlock, and saw Melton fall to the ground. Nellum "got on top of [Melton] and just beat [him], I mean, literally just beat [him]" with the padlock. Haney testified that after the first hit from Nellum, Melton "was out." Haney then witnessed Hampton try to push Nellum off of Melton and try to stop him from beating Melton. Haney testified that after Nellum beat Melton, Hampton then went through Melton's pants pockets and removed an item or items.

¶6. Hampton testified on his own behalf. He stated that on the evening of June 30, 2011,

3

he and O'Neal took a walk, where they ran into Haney and eventually Nellum and Melton. Hampton overheard Nellum ask Melton when Melton would pay him the money he owed. Nellum joined Hampton, O'Neal, and Haney, but Melton walked in a different direction. Hampton testified that O'Neal "and them" encouraged Nellum to "beat [Melton's] A" since he owed Nellum money. According to Hampton, Nellum asked him for the padlock Hampton had hanging from his pants, and Hampton handed it to him. Nellum then ran after Melton and began hitting him. When questioned, Hampton denied having any knowledge that Nellum would use the padlock to beat Melton to death. Hampton testified that he tried to pull Nellum off of Melton, but Nellum "swung back with the lock," so Hampton "jumped out of the way from being hit with it." Hampton stated that Nellum stopped hitting Melton only when Hampton pulled Nellum off of him. Hampton admitted to removing Melton's wallet from his pants pocket, but he denied removing any money. Hampton stated that he dropped the wallet down at the scene. Hampton, Nellum, Haney, and O'Neal then left the scene through the nearby park. As they left, O'Neal pointed out that Hampton had blood on his shirt, so Hampton took his shirt off at the park. Hampton admitted under oath that during his police interview, he had not told the police the full story regarding the details of June 30, 2011. Hampton maintained under oath that he was not guilty of any crime.

¶7.     Maude Skipper, Hampton's sister, testified that on the evening of June 30, 2011, she saw Hampton and Richard O'Neal together. Skipper observed that Hampton was wearing a white t-shirt and blue jeans. Skipper testified that at some point that evening, the two men left the house and walked towards Hannah Street. Skipper stated that when Hampton and

4

O'Neal returned to the house later, Hampton was no longer wearing a shirt.

¶8. Adrian Bell, Hampton's girlfriend at the time, and Rosezella Canady, Hampton's mother, both testified that they saw Hampton on the evening of June 30, 2011. Bell and Canady testified that they observed Hampton wearing a white t-shirt, and then when he returned home later that evening, he was no longer wearing a shirt.

¶9. Officer Earnest Gilson and Officer Ozie Carter of the Indianola Police Department both testified that they were dispatched to the 400 block of Hannah Street on the evening of June 30, 2011. Both officers testified that upon arriving on the scene, they observed a male lying facedown on the sidewalk. Officer Gilson also observed a lock with a shoestring tied around it lying on the ground approximately three feet from Melton's body. Officer Gilson also testified that on the morning after the murder, police officers recovered a shirt from the park near where Melton's body was found. Officer Gilson also stated that he received an anonymous text message on his phone that evening providing the names of two individuals: Gerod Nellum and Nathaniel Hampton.

¶10. Officer Charles Dones testified that he was dispatched to secure the crime scene on June 30, 2011. Officer Dones stated that he collected a white t-shirt from the park on Hannah Street on the morning after the murder. Officer Dones also testified that officers recovered another t-shirt and a pair of blue jeans in the proximity during the investigation.

¶11. Dr. Mark LeVaughn, the chief medical examiner for the State, performed an autopsy on Melton. Dr. LeVaughn provided testimony identifying Melton's manner of death was homicide, bought about by multiple blunt trauma.

¶12. After a trial held on May 27, 2014, the jury returned a verdict of guilty of capital murder. The trial court then sentenced Hampton to serve a life sentence in the custody of the MDOC. Hampton filed a motion for a judgment notwithstanding the verdict (JNOV), or, in the alternative, a motion for a new trial. The trial court denied Hampton's posttrial motions, and Hampton now appeals.

## STANDARD OF REVIEW

¶13. "The standard of review for a trial court's decision regarding whether to grant a mistrial is abuse of discretion." *Ross v. State*, 16 So. 3d 47, 57 (¶22) (Miss. Ct. App. 2009). The Uniform Rules of Circuit and Court provide that a trial court may, upon its own motion, declare a mistrial if "[t]he trial cannot proceed in conformity with law; or [i]t appears there is no reasonable probability of the jury's agreement upon a verdict." *Id*.; *see* URCCC 3.12.

¶14. A motion for a JNOV "challenge[s] the legal sufficiency of the evidence presented at trial." *Reed v. State*, 956 So. 2d 1110, 1111 (¶6) (Miss. Ct. App. 2007). When reviewing the sufficiency of the evidence on appeal, "all evidence supporting the guilty verdict is accepted as true, and the State must be given the benefit of all reasonable inferences that can be reasonably drawn from the evidence. Furthermore, it is well-settled law that the jury determines the credibility of witnesses and resolves conflicts in the evidence." *Id*.

## DISCUSSION

### I. Mistrial

¶15. Hampton argues that the trial court erred in failing to grant a mistrial after members of the jury allegedly viewed Hampton while he was in shackles and behind bars. To review

this assignment of error, we must turn to the record and consider the evidence.

¶16. The record reflects that after the jury returned to the courtroom from a lunch break, defense counsel brought to the trial court's attention that several jurors viewed Hampton handcuffed and behind bars in the courthouse holding cell. The trial court held a bench conference on the matter, wherein the transportation officer denied the defense counsel's claim. The transportation officer provided that the jurors could not see Hampton because a closed curtain blocked the jurors' view of the holding cell. The trial court then instructed the attorneys and transportation officer to "pay attention," and the trial court reminded the transportation officer that she was "in charge of security." The trial court then proceeded to address the next matter of business. The record reflects that the defense raised no motion for a mistrial.

¶17. The State maintains that the record clearly shows that the defense counsel did not actually know or present any evidence as to whether any juror actually saw Hampton in the holding cell, as evidenced by the following exchange:

| Defense Counsel: | Okay. They—the courtroom bailiff states that she's—she's one of the alternates, so it may not be—be a problem. |
| --- | --- |
| The Court: | All right. I was going to just ask the question: How do we cure it? And I was going to suggest that, if she were not, if you-all would agree— |
| Defense Counsel: | Well, I don't know— |
| The Court: | —that she could be an alternate. |
| Defense Counsel: | She, I remember, because she came out—well, as I was coming in, she came out of the jury room and came |

7

through. When she came around that corner and kind of could see everybody, that's when the tall jury bailiff said something to them about closing the curtain, and they closed it. So I wasn't sure if she saw him coming—as she was going out, but as she was coming in, I was standing out there in the hall when her and a couple of the other jurors came back through; and I know they had to see it. Because by the time they closed the curtain, they was in the hall.

The defense counsel later claimed, "I know they had to see it."

¶18. As stated, this Court reviews a trial court's decision regarding whether to grant a mistrial for an abuse of discretion. *Ross*, 16 So. 3d at 57 (¶22). The supreme court has held that "mistrials should only be declared sua sponte under our 'manifest necessity' rule." *Younger v. State*, 931 So. 2d 1289, 1291 (¶7) (Miss. 2006). Per the guidance provided by our supreme court, this Court recognizes:

Whether the manifest necessity standard has been met turns on the facts and circumstances of each case. The supreme court has recognized several examples where a declaration of a mistrial would likely be a manifest necessity: failure of a jury to agree on a verdict; a biased or otherwise tainted jury; improper separation of the jury; where jurors showed an unwillingness to follow the court's instructions. The question here is whether the jury was biased or tainted beyond cure as a result of [seeing Hampton in handcuffs and in the holding cell].

*Reed v. State*, 764 So. 2d 511, 514 (¶10) (Miss. Ct. App. 2000).

¶19. Hampton cites to *Payton v. State*, 897 So. 2d 921, 931 (¶6) (Miss. 2003), where the defendant, Payton, claimed he was denied a fair and impartial trial because he was brought before the jury wearing cuffs around his ankles and his waist. The supreme court held that

[p]ermitting the jury to see the defendant bound and shackled improperly encroaches on the defendant's presumption of innocence. If this right of the accused is violated, it may be ground for the reversal of [the] conviction.

8

> However, the failure, through an oversight, to remove handcuffs from a prisoner for a short time or any technical violation of the rule prohibiting shackling, not prejudicial to him, is not ground for reversal.

*Id*. at 931-32 (¶12) (internal citations omitted); *see also Hickson v. State*, 472 So. 2d 379, 383 (Miss. 1985).

¶20. The supreme court also explained that "[t]his Court has routinely upheld the trial court's refusal to grant a mistrial even in cases where the record affirmatively shows that jurors actually saw the defendant in restraints. In addition, without a showing of prejudice, this Court has generally been unwilling to reverse a conviction on these grounds." *Payton*, 897 So. 2d at 932 (¶16) (internal citations omitted).[1] Because Payton presented no evidence that any juror actually saw him in restraints or that the jury was unfair or partial, the supreme court found that Payton failed to meet his burden of proving that reversible error occurred. *Id*. at (¶¶17-18).

¶21. The facts in the case at bar are similar to *Payton* in that the record herein reflects no evidence or finding that any juror actually saw Hampton in restraints or behind bars in the holding cell. Furthermore, the record shows that the defense counsel failed to raise a motion for a mistrial or raise any objection to the trial court's corrective action or ruling when issued below. We find that Hampton fails to demonstrate any prejudice or bias resulting from the possibility that jurors could have seen him in handcuffs and in the holding cell. *Id*. As a result, we find that this issue lacks merit.

---

[1] *See Lockett v. State*, 517 So. 2d 1317, 1329 (Miss. 1987) (defendant was brought into the courtroom with handcuffs on his wrists and ankles); *Hickson*, 472 So. 2d at 383 (defendant was handcuffed in the presence of the jury for between thirty minutes and an hour).

**II.      Sufficiency of the Evidence**

¶22.    Hampton next argues that the evidence presented by the State during its case-in-chief is insufficient to support a verdict of guilty as to the charge of capital murder. Hampton specifically claims that the State failed to present sufficient evidence to establish Hampton's intent to rob Melton, the victim. As stated above, when reviewing the sufficiency of the evidence on appeal, "all evidence supporting the guilty verdict is accepted as true, and the State must be given the benefit of all reasonable inferences that can be reasonably drawn from the evidence." *Reed*, 956 So. 2d at 1111 (¶6).

¶23.    Mississippi Code Annotated section 97-3-73 (Rev. 2014) provides: "Every person who shall feloniously take the personal property of another, in his presence or from his person and against his will, by violence to his person or by putting such person in fear of some immediate injury to his person, shall be guilty of robbery." The supreme court has set forth the following elements that must be proven to find a defendant guilty of robbery: the defendant "(1) feloniously took (2) the personal property of another (3) in his presence or from his person and (4) against his will, (5) by violence to his person or by putting such person in fear of some immediate injury to his person." *Batiste v. State*, 121 So. 3d 808, 830 (¶27) (Miss. 2013) (citing *Fulgham v. State*, 46 So. 3d 315, 323 (¶24) (Miss. 2010)). Furthermore, the supreme court instructed that "the intent to rob (felonious intent) is an essential element of capital murder with the underlying felony of robbery." *Id.* (citing *Gillett v. State*, 56 So. 3d 469, 492 (Miss. 2010)).

¶24.    Mississippi Code Annotated section 97-3-19(2)(e) (Supp. 2015) states that "[t]he

killing of a human being without the authority of law by any means or in any manner shall be capital murder . . . [w]hen done with or without any design to effect death, by any person engaged in the commission of the crime of . . . robbery." In *Batiste*, 121 So. 3d at 831-32 (¶33), the supreme court held that "Mississippi follows the 'one-continuous-transaction' rule for determining whether the evidence establishes the requisite nexus between the killing and the underlying felony to constitute capital murder." The *Batiste* court stated that "where the two crimes [e.g., murder and robbery,] are connected in a chain of events and occur as part of the res gestae, the crime of capital murder is sustained." *Id*. (citing *Gillett*, 56 So. 3d at 492).

¶25.    When the underlying felony for a capital-murder charge is robbery, the *Batiste* court explained that "if the intervening time between the time of the murder and the time of taking of the property formed a continuous chain of events, the fact that [the victim] was dead when [the defendant] took the property [cannot] absolve [him] from the crime of robbery"; accordingly, "the State need not prove the defendant had the intent to rob prior to the killing." *Id*. at 832 (¶33). Instead, the State possesses the burden to prove that "the two crimes are connected in a chain of events and occur as part of the res gestae." *Id*. (quoting *Pickle v. State*, 345 So. 2d 623, 627 (Miss. 1977)); s*ee Spicer v. State*, 921 So. 2d 292, 317 (¶50) (Miss. 2006) ("The fact that the actual moment of the victim's death preceded consummation of the underlying felony does not vitiate the capital charge.") *abrogated on other grounds by O'Connor v. State*, 120 So. 3d 390, 400-01 (¶¶28-19) (Miss. 2013).

¶26.    Hampton claims that under the one-continuous-transaction rule, his conviction must

11

be reversed if the State failed to show that he intended to rob the victim before he was fatally attacked. The State maintains that its primary position is that the State indeed proved that Hampton intended to rob the victim prior to the fatal beating by sufficient evidence for the jury to find Hampton guilty beyond a reasonable doubt. However, the State further argues that even if Hampton's intent to rob was not formed until the beating was already in progress, the evidence was still sufficient to support a conviction for capital murder. The State asserts that the fatal beating and the taking of the wallet were connected in a continuous chain of events so as to qualify as "one continuous transaction." Hampton provided Nellum, who expressed a clear intent to get money from Melton, with a weapon to beat Melton to death, and after the fatal beating, Hampton stole the victim's wallet.

¶27. The record reflects that Nellum and Hampton were indicted for committing capital murder while acting in concert with, or aiding and abetting, each other. Accordingly, the jury was instructed that it could find Hampton guilty of capital murder if it found that he acted in concert with, or aided and abetted, Nellum in killing Melton during the commission of a robbery. Conversely, the jury was also instructed that if it believed that Hampton did kill Melton, but did not believe that Hampton killed Melton while in the commission of a robbery, then the jury could find Hampton guilty of the lesser included offense of murder. The jury was also instructed that the underlying crime of robbery need not occur prior to the victim's death in order to satisfy the robbery element of capital murder. The elements of robbery were properly set forth in jury instructions 8 and 17. "We presume that the jury followed the instructions given by the trial court." *Batiste*, 121 So. 3d at 834 (¶37); *see also*

12

*Pitchford v. State*, 45 So. 3d 216, 240 (¶96) (Miss. 2010).

¶28. We find the record shows that sufficient evidence was presented at trial to support the jury's verdict. At trial, Haney and O'Neal both testified that Nellum informed them that he was going to "whoop" Melton because Melton owed him $120. Hampton also confirmed this account, but testified that Haney and O'Neal essentially egged it on by stating: "[T]hey were like, Nigga owe me money, I beat his 'A.' Nigga owe me money—they kept repeating it." Hampton, O'Neal, and Haney all consistently testified that Hampton then gave Nellum the padlock, which Nellum used to beat Melton to death. Hampton acknowledged that he carried the lock purportedly to use as a weapon to protect himself. It is also undisputed that Hampton removed Melton's wallet from his pocket after Nellum fatally beat Melton.

¶29. We recognize that Hampton's intent to rob Melton is a question of fact to be determined by a jury based on the facts presented in the case. *Hughes v. State*, 983 So. 2d 270, 279 (¶29) (Miss. 2008). After reviewing the record before us, we find that the record contains sufficient evidence from which a rational juror could find beyond a reasonable doubt that Melton's murder and the removal of his wallet were part of a continuous chain of events, such that Hampton could be found guilty of capital murder with the underlying felony of robbery. *See Batiste*, 121 So. 3d at 833 (¶35). Accordingly, this issue lacks merit.

¶30. **THE JUDGMENT OF THE SUNFLOWER COUNTY CIRCUIT COURT OF CONVICTION OF CAPITAL MURDER AND SENTENCE OF LIFE IN THE CUSTODY OF THE MISSISSIPPI DEPARTMENT OF CORRECTIONS WITHOUT THE POSSIBILITY OF PAROLE IS AFFIRMED. ALL COSTS OF THIS APPEAL ARE ASSESSED TO SUNFLOWER COUNTY.**

**LEE, C.J., IRVING AND GRIFFIS, P.JJ., BARNES, ISHEE, FAIR, JAMES, WILSON AND GREENLEE, JJ., CONCUR.**