# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2022-KA-01069-COA

**MARLON BOYD**                                                                  **APPELLANT**

**v.**

**STATE OF MISSISSIPPI**                                                      **APPELLEE**

DATE OF JUDGMENT:                08/05/2022
TRIAL JUDGE:                            HON. MARK SHELDON DUNCAN
COURT FROM WHICH APPEALED:    NESHOBA COUNTY CIRCUIT COURT
ATTORNEYS FOR APPELLANT:       OFFICE OF STATE PUBLIC DEFENDER
                                              BY: GEORGE T. HOLMES
                                              CHARLES MITCHELL McGUFFEY
                                              THOMAS PEYTON SMITH
ATTORNEY FOR APPELLEE:           OFFICE OF THE ATTORNEY GENERAL
                                              BY: BARBARA WAKELAND BYRD
DISTRICT ATTORNEY:                  STEVEN SIMEON KILGORE
NATURE OF THE CASE:                CRIMINAL - FELONY
DISPOSITION:                            AFFIRMED - 04/09/2024
MOTION FOR REHEARING FILED:

**BEFORE CARLTON, P.J., LAWRENCE AND SMITH, JJ.**

**CARLTON, P.J., FOR THE COURT:**

¶1.     A Neshoba County grand jury indicted Marlon Boyd, along with Shellie Shianne White and Brandon Goodin, for capital murder for the shooting and killing of Desmond Davis during a robbery. White and Goodin pleaded guilty to lesser offenses.

¶2.     After a jury trial, Boyd was convicted, and the trial court sentenced Boyd to serve a sentence of life imprisonment without eligibility for parole. Boyd appeals, asserting that his conviction was not supported by sufficient evidence on all the necessary elements of capital murder—namely, that the State failed to prove Davis was killed in the course of a robbery.

Boyd also asserts that for the same reason, the jury's verdict was contrary to the weight of the evidence. As addressed below, we affirm Boyd's conviction and sentence.

**STATEMENT OF FACTS AND PROCEDURAL HISTORY**

¶3. Between midnight and 1:00 a.m. on Saturday, March 27, 2021, Davis was found shot to death outside room 145 at the Western Motel in Philadelphia, Mississippi. Two eyewitnesses identified Boyd as the shooter.

¶4. Detective Bobby Patillo of the Philadelphia Police Department investigated the case. He testified at trial. At the scene, Detective Patillo took photographs, collected physical evidence (including a shell casing and two bullets), obtained surveillance video footage of the shooting, and talked to eyewitness Robert Hickman. In the course of his investigation, Detective Patillo reviewed the surveillance video and talked to Goodin (the other eyewitness), Rachel (Goodin's wife), and White. Additionally, a few days after the shooting, Hickman went to the police station and gave a more detailed statement.

¶5. Detective Patillo testified that Hickman and Goodin identified Boyd as the shooter; Goodin admitted he was the person on the surveillance video wearing a red hoodie; and Goodin, White, and Hickman said that Boyd was the person wearing the blue hoodie. Boyd was located and taken into custody about a week after the shooting.

¶6. Goodin testified for the State. As noted, he, along with White and Boyd, had been indicted for capital murder. He pleaded guilty to manslaughter prior to trial. Goodin testified that on the Friday afternoon before the shooting, he, his wife Rachel, White, and Boyd went

2

to Philadelphia from his home in House, Mississippi, to buy Xanax from Davis.[1] Goodin had been texting with Davis about buying the Xanax earlier that day, and they arranged to meet at the bank. Goodin bought four Xanax, and the group eventually returned to the Goodins' home. Goodin testified that each of them took a Xanax and spent the afternoon drinking and smoking marijuana.[2]

¶7. Later that day, Goodin talked to Davis again about getting more Xanax. Davis asked Goodin to "bring[] some females over," and told Goodin that he was at the Western Motel in Philadelphia. Goodin also testified that Boyd and Davis "were talking about a gun [purchase] earlier in the day." So shortly after midnight, Goodin, Boyd, and White drove to Philadelphia a second time.

¶8. Goodin testified that Boyd was the first to bring up robbing Davis. He said that when he, Boyd, and White went to meet Davis for the second time, "[Boyd] mentioned going to rob [Davis]" on the way there. When Goodin was specifically asked, "Did y'all talk about it [(robbing Davis)] before you went to Philadelphia?" Goodin testified, "Earlier that day we were talking about it and then really forgot about it and then on the way that night, he brung

---

[1] At trial, Boyd presented an alibi defense, claiming that he was not with White or the Goodins at any time during the relevant time period. The State presented multiple witnesses who were able to identify Boyd with the Goodins and White that day. The jury rejected Boyd's alibi defense. Boyd states in his appellant brief that "for purposes of this appeal *only*, [he] does not contest his whereabouts."

[2] White testified that after their first trip to Philadelphia, she, Rachel, Goodin, and Boyd spent the afternoon at the Goodins "hanging out" and drinking, taking Xanax, and smoking marijuana. She clarified that she did not do any drugs because she had a drug test for a new job coming up, but she did drink two six-packs of wine coolers over the course of the day.

it back up." After Boyd brought up robbing Davis again, Goodin "texted . . . [Davis], and we and went over there."

¶9.     Goodin testified that Boyd said, "You need to get Dez [(Davis)] so we can hit this lick. And I said, All right. And I did it." Goodin testified that "hit this lick" meant "rob him, you know, try to get some Xanax and I guess money or something." Goodin confirmed he knew that he and Boyd were going to rob Davis but acknowledged they had no specific plan:

[STATE]:     Did y'all have a plan?

[GOODIN]:   No, sir. Not really. Not at all.

[STATE]:     Y'all were just going to go in and see what happened?

[GOODIN]:   Go in—my thing was we were going to go in there, try to steal the Xanax and get on down. But it didn't go that way check [sic].

¶10.    Goodin said that when they got to Philadelphia, Boyd told White to "pull into the back" at the Western Motel, which was opposite Davis's room. White stayed in the car, and Goodin and Boyd got out with their guns. Goodin had a 9-millimeter pistol and Boyd had a Glock 22. Goodin thought they were going to "snatch" the Xanax from Davis when he pulled it out and then run.

¶11.    On the way to Davis's room, Goodin and Boyd ran into Hickman. Boyd knew Hickman, and they talked to him for a minute. Then they talked to another person Goodin did not know. About that time, Hickman, who had driven his truck near Davis's room, got out of his truck and knocked on the door to Davis's room. When Davis opened the door, Hickman, Boyd, and Goodin all walked in together. Goodin testified that in the motel room,

4

Boyd and Davis were talking about Davis buying a gun from Boyd. Then "[Boyd] pulled out a gun and was like trying to show . . . but [Davis] snatched it, and then we started fighting and went out the door." Goodin said as far as he could tell, Boyd did not pull the gun out in a threatening manner, but Goodin admitted he "wasn't paying attention to them that much."

¶12. Goodin testified that the fight started in Davis's room and then went out into the parking lot in front of the room. Goodin started picking up money "that flung out during the fight." Goodin testified that the money "had to have been [Davis's]." Afterward, Goodin ran around the corner, then came back. Goodin testified that when he came back, he saw Boyd grab a gun from the hood of Hickman's truck and shoot Davis. Goodin heard two shots. At that point, Goodin testified that he "freaked out and ran . . . around and got in [White's] car and [they] left" without Boyd. Goodin was asked, "Was shooting [Davis] part of y'all's plan?" He responded, "No, sir. Not at all and really—no, sir."

¶13. Goodin told White what happened. White drove to a gas station to get cigarettes, as they originally planned, and then she drove to a car wash to vacuum her car. Goodin testified that he thought White's vacuuming was her way of "trying to collect her mind." On their way back to Goodin's house, his mother-in-law called him and said that Boyd was there. Goodin testified that when he and White arrived at his house, he got mad and told White and Boyd to leave.

¶14. During redirect examination, Goodin testified that he "plead[ed] guilty—because [he] didn't kill [Davis]" but "went there to rob him"; Goodin admitted that Davis got killed during the course of the robbery and that he (Goodin) was participating in it.

5

¶15.    White pleaded guilty as an accessory after the fact to Davis's murder and testified for the State at Boyd's trial. She corroborated much of Goodin's testimony about the events on that Friday afternoon. She also testified about the events that took place when she, Boyd, and Goodin traveled to Philadelphia again around midnight. White drove. Before they got to town, Boyd and Goodin told her to pull into the Western Motel, which she did. She parked in the only parking spot available between the dumpsters and pool. Boyd and Goodin got out of her car while she stayed there. They told her they would not be long. When asked at trial whether Boyd and Goodin had guns, White replied, "They usually always have their guns with them."

¶16.    After ten or fifteen minutes, White heard four gunshots. The gunshots scared her, so she put her car in drive, but then Goodin came running toward her car. White did not see Boyd, but Goodin got in her car and told her he thought Boyd had shot someone. White corroborated Goodin's testimony about what they did before returning to Goodin's house.

¶17.    When White and Goodin got to his house, Boyd was there. Boyd told them someone had dropped him off. White testified that when they went to town, Goodin was wearing a red hoodie with basketball shorts, and Boyd was wearing a blue hoodie with basketball shorts. But when they got back to the Goodins' house, Boyd was no longer wearing the blue hoodie but, instead, a t-shirt.

¶18.    After she and Boyd were asked to leave the Goodins' house, Boyd asked White for a ride to Meridian. She agreed to take him there. White testified that she did not see Boyd with a gun during the drive to Meridian. She was not sure where she dropped Boyd off, but

6

it was somewhere in Meridian. White testified that she asked Boyd "did he shoot and kill someone," and Boyd "didn't say anything at all." White denied having any knowledge about a plan to rob Davis.

¶19. Hickman also testified at trial. He said he saw Boyd and Goodin at the motel the night of the shooting. Hickman testified that he said to Boyd, "What y'all fixing to do?" And [Boyd] said, "I'm fixing to go hit a lick," which Hickman understood to mean "rob somebody." Boyd showed Hickman a gun and Hickman told both of them to be careful. Hickman testified Boyd was wearing a blue hoodie with the hood on, and Goodin was wearing a red hoodie.

¶20. About five minutes after Boyd and Goodin walked away, Hickman drove his truck over to Davis's room and pulled up right in front of it. He saw Boyd and Goodin "beating at [Davis's] window," but Davis was not answering. Hickman got out of his truck, and as he was doing so, Boyd said, "Man, I know he in there because we just got through talking to him on the phone." Hickman knocked "a good six knocks," and Davis finally opened the door. Hickman walked in the room first, followed by Boyd and Goodin.

¶21. The prosecutor asked Hickman what happened once they were all in the room. Hickman said that Boyd told Davis that he wanted $700 for his gun. When Davis began to take out his money, "[Boyd] nodded his head to [Goodin], and [Goodin] pulled up his gun. [Davis] ran towards him. That's when they got to fighting."

¶22. The State's questioning continued, as follows:

[STATE]:     All right. So [Davis] agreed to buy the gun?

7

[HICKMAN]:        Yes, sir.

[STATE]:          Pulled his money out?

[HICKMAN]:        Yes, sir.

[STATE]:          And who nodded?

[HICKMAN]:        [Boyd] nodded his head like this.

[STATE]:          To . . . Goodin?

[HICKMAN]:        Yes, sir.

[STATE]:          And then [] Goodin pulled his gun out?

[HICKMAN]:        Gun out.

. . . .

[STATE]:          What did [Goodin] do with it once he pulled it out?

[HICKMAN]:        He just held it.  He didn't try to do nothing. He just held it in his hand, and that's when [Davis] rushed him.

[STATE]:          [Davis] saw him [(Goodin)] pull the gun out?

[HICKMAN]:        Pull the gun out, yes, sir. . . .  I guess [(Davis)] knew something was about to go on because he [(Davis)] rushed him. And when [Davis] rushed [Goodin], that's when they started jumping on him. And they started fighting, and they ended up out of the room fighting.

¶23.   Hickman testified that he ran to his truck when he made it outside the motel room. He knew both Boyd and Goodin had guns, and he did not know what might happen.  On his way to the truck, Hickman picked up a twenty-dollar bill, and he said, "[T]here was a lot more stuff on the ground."

¶24.   As Hickman was backing out his truck to leave, Boyd "grabbed a gun from off

8

[Hickman's] truck . . . and shot [Davis]." Davis fell over. Hickman testified that after Boyd shot Davis, Boyd went over and "started searching [Davis's] pockets, pulling on him and stuff." According to Hickman, Boyd saw people looking at him and then started shooting at them (about four or five times).

¶25. Hickman drove to the front office and used the phone there to call 911. When the police arrived, Hickman went outside and told them what had happened.[3] Hickman later learned there was surveillance video footage of the shooting, and he reviewed it at the police station.

¶26. The surveillance footage was played during Detective Patillo's testimony. As the video was played, Detective Patillo identified Boyd in the blue hoodie and Goodin in the red hoodie based on what he learned when he interviewed Goodin, Hickman, and White. The motel surveillance video showed the fight erupting from Davis's room. After a few seconds of fighting, Goodin began picking things up from the ground outside the room and ran off, followed by Hickman, who left the room and picked up something off the ground in front of the room. Boyd and Davis continued fighting in the background. Hickman, driving his white truck (parked in front of the room), began to pull away when Boyd ran behind and then beside Hickman's truck. Boyd was out of the camera's view for a few seconds, and then Boyd was filmed shooting Davis. Goodin returned for a few seconds and then left. During this time, Boyd was going through Davis's pockets and pulling on him. Boyd then started

_____

[3] As noted, a few days after the shooting, Hickman went to the police station to give a more detailed statement than the one he gave at the scene. By that time, he had learned Boyd's name and Hickman, again, told investigators that Boyd was the shooter.

9

picking things up off the ground near Davis's body through the end of the video. In narrating the surveillance video, Detective Patillo confirmed that Boyd, in a blue hoodie, could be seen picking up items during the last minute or so on the surveillance video, but Detective Patillo was unable to identify those items.

¶27. The State rested, and the defense unsuccessfully moved for a directed verdict.

¶28. Boyd did not testify on his own behalf, but the defense presented three alibi witnesses who offered varying accounts of Boyd's whereabouts during the Saturday shooting. His uncle testified that he talked to Boyd, who told him he was "headed to Meridian[, Mississippi]" on the Friday before the Saturday shooting. Boyd's mother testified that she had seen Boyd in Meridian (albeit after the shooting), and his girlfriend testified that Boyd had been in Meridian since the Thursday before the shooting and stayed there until he was arrested several days after the shooting.

¶29. The State called Rachel Goodin as a rebuttal witness, who testified that Boyd had been in Philadelphia when she saw him both before and after the shooting.[4]

¶30. The jury found Boyd guilty of capital murder, and the trial court sentenced him to life imprisonment as set forth above. Boyd filed an untimely motion for a new trial, asserting, among other points, that "[t]he verdict was against the overwhelming weight of the evidence." The trial court did not rule on the pending motion; instead, it was deemed denied by operation of law thirty days from the date it was filed. MRCrP 25.3. Boyd also filed a motion for an out-of-time appeal, which was granted.

---

[4] As noted, during the State's case-in-chief, White, Goodin, and Hickman all identified Boyd as the person in the blue hoodie in the motel surveillance video.

10

### I. Sufficiency of the Evidence

¶31. Boyd asserts on appeal that there was insufficient evidence to support the underlying felony of robbery for his capital murder conviction. "In reviewing the sufficiency of the evidence on appeal, we view the evidence in the light most favorable to the State and decide if rational jurors could have found the State proved each element of the crime." *Hamer v. State*, 364 So. 3d 901, 910 (¶31) (Miss. Ct. App. 2022). In this regard, we "must accept as true all credible evidence consistent with guilt and give the State the benefit of all favorable inferences that may reasonably be drawn from the evidence." *Story v. State*, 296 So. 3d 104, 115 (¶30) (Miss. Ct. App. 2019) (internal quotation marks omitted). For the reasons addressed below, we find that a reasonable juror in this case could rationally find that Boyd committed the elements of capital murder with the underlying felony of robbery.

### A. Procedural Bar

¶32. The State asserts that Boyd did not challenge the sufficiency of the evidence before the trial court with specificity, and, therefore, this issue is procedurally barred. *See, e.g.*, *Jordan v. State*, 936 So. 2d 368, 372 (¶20) (Miss. Ct. App. 2005) (recognizing that "[a] motion for a directed verdict on the grounds that the [S]tate has failed to make out a prima facie case must state specifically wherein the [S]tate has failed to make out a prima facie case"). In moving for a directed verdict, Boyd's counsel stated, "Comes now the Defendant and moves the Court to [enter] a directed verdict in his favor as the State has failed to make

---

[5] The applicable standard of review for each issue is discussed in context.

11

out a case . . . for which the jury can find him guilty beyond a reasonable doubt." In his motion for a new trial, Boyd generally asserted, "The verdict was against the overwhelming weight of the evidence."

¶33. Boyd's challenges to the sufficiency of the evidence are clearly vague and general in nature. Nevertheless, we will proceed to address this issue on the merits. *See Gary v. State*, 11 So. 3d 769, 771 (¶8) (Miss. Ct. App. 2009) ("[N]otwithstanding [the defendant's] failure to challenge the sufficiency of the evidence with specificity, we will address this issue for the sake of discussion."); *Jordan*, 936 So. 2d at 373 (¶22) (addressing insufficiency of the evidence issue on the merits despite the "vague and general" nature of defendant's motion for judgment notwithstanding the verdict).

### B. Statutory Framework

¶34. Mississippi Code Annotated section 97-3-19(2)(e) (Rev. 2020) provides that "[t]he killing of a human being without the authority of law by any means or in any manner shall be capital murder . . . [w]hen done with or without any design to effect death, by any person engaged in the commission of the crime of . . . robbery . . . ." In defining "robbery," Mississippi Code Annotated section 97-3-73 (Rev. 2020) provides that "[e]very person who shall feloniously take the personal property of another, in his presence or from his person and against his will, by violence to his person or by putting such person in fear of some immediate injury to his person, shall be guilty of robbery."

### C. Boyd's Contentions

¶35. Boyd asserts that "the State failed to provide evidence that [he] was engaged in a

12

robbery" when he shot and killed Davis. He raises two points in support of this assertion. First, Boyd asserts that "[t]he record is undisputed that [Boyd] never said to anyone that he intended to rob Davis," but rather the State relied "solely on Goodin's and Hickman's interpretation of the phrase 'hit a lick.'" Second, Boyd asserts that there is no evidence that he robbed or attempted to rob Davis. Contrary to both of these assertions, we find that the State presented sufficient evidence to allow a rational juror to conclude beyond a reasonable doubt Boyd killed Davis during the commission of a robbery, as required to support Boyd's conviction for capital murder with the underlying crime of robbery.

¶36. First, we find that sufficient evidence supports that Boyd intended to rob Davis. Goodin's testimony shows that Boyd used the terms "rob" and "hit a lick" interchangeably when talking about what he intended to do that evening. Goodin testified that when he, Boyd, and White went to meet Davis in Philadelphia for the second time, "[Boyd] mentioned going to *rob* [Davis]" on the way there. (Emphasis added). Goodin elaborated on that conversation, as follows:

> [STATE]: When did you and Marlon decide to rob [Davis]?
>
> [GOODIN]: Really on the way there—on the way—the second time to Philadelphia, and he [(Boyd)] brung it back up. And I texted him [(Davis)], and we went over there.
>
> . . . .
>
> [STATE]: What did he [(Boyd)] say?
>
> [GOODIN]: He was like, You need to get Dez [(Davis)] so we can *hit this lick*. And I said, All right. And I did it.
>
> [STATE]: He said, "We're going to hit this lick"?

13

[GOODIN]: Hit this lick - *rob him*, you know, try to get some Xanax and I guess money or something.

[STATE]: So you knew y'all were going to rob Desmond?

[GOODIN]: Yes, sir.

(Emphasis added).

¶37. We recognize Goodin acknowledged that he and Boyd did not have a specific plan in place to rob Davis, but the highlighted language shows Goodin plainly testified that he and Boyd talked about and intended to rob Davis—whether for Xanax or money or both. Indeed, the second time Boyd brought up robbing Davis, Goodin was the one who texted Davis; then Goodin and Boyd "went over there [(the Western Motel)]."[6] Both Boyd and Goodin had their guns that evening.

¶38. In light of Goodin's testimony about what he and Boyd had discussed before running into Hickman at the Western Motel, and viewing the evidence in the State's favor, we find that a juror could also reasonably infer that Boyd meant he was going to rob Davis when he told Hickman he was "fixing to go hit a lick." Hickman testified that robbery was what he understood Boyd to mean. When Hickman was asked during direct examination what "hit a lick" meant, Hickman said, "I mean I guess he's [(Boyd's)] going to rob somebody. I mean . . . ." The prosecutor asked, "Is that what you thought it meant?" Hickman responded, "Yes, sir." In short, we find there was sufficient evidence that a rational juror could

---

[6] Goodin and Davis had been texting earlier that day about Goodin getting more Xanax and bringing "some females over," so Goodin knew Boyd was at the Western Motel.

reasonably find that Boyd intended to rob Davis.[7]

¶39. Second, Boyd's assertion that no evidence supports that he robbed or attempted to rob Davis is simply not supported by the record. Rather, the evidence is sufficient to show that Boyd attempted—and did—rob Davis in the course of the murder.

¶40. As noted, Boyd and Goodin were armed that night when they went to the Western Motel to meet Davis. Boyd and Goodin, along with Hickman, entered Davis's motel room. Boyd and Davis were discussing Davis buying Boyd's gun. To be sure, Goodin did not offer very many details about what happened next, but he testified that he had taken a Xanax earlier that day and spent the afternoon drinking and smoking marijuana. According to Goodin, when Boyd pulled out his gun in Davis's motel room, "[Davis] grabbed it[,] and it [(the gun)] went into him, and then we both [Boyd and Goodin] just started fighting him [(Davis)] at that time."

¶41. Hickman—who was not involved in the gun transaction conversation or the fight—offered more details about what happened. Like Goodin, he said that Boyd and Davis

---

[7] Even if the State had not offered sufficient proof of Boyd's intent to rob Davis, "Mississippi follows the 'one-continuous-transaction' rule for determining whether the evidence establishes the requisite nexus between the killing and the underlying felony to constitute capital murder." *Batiste v. State*, 121 So. 3d 808, 831 (¶33) (Miss. 2013). That is, "[w]here the two crimes (e.g., murder and robbery) are connected in a chain of events and occur as part of the res gestae, the crime of capital murder is sustained." *Id.* at 831-32 (¶33). So, "[t]he State need not prove the defendant had the intent to rob prior to the killing[;] [but] [r]ather, [the State]. . . has the burden to prove that the two crimes are connected in a chain of events and occur as part of the res gestae." *Id.* (citations and internal quotation marks omitted); *see also Hamer*, 364 So. 3d at 910 (¶34); *Hampton v. State*, 188 So. 3d 625, 630 (¶¶24-25) (Miss. Ct. App. 2016). The evidence shows that mere seconds elapsed between Boyd shooting Davis and Boyd searching his pockets and picking up items near Davis's body. As such, we find that the State was not required to prove Boyd's "intent" to rob Davis in this case.

15

had resumed their conversation from earlier that day about Davis buying Boyd's gun. According to Hickman, Boyd said, "You already know what we talked about. You know how much I said I wanted for the gun, and that was $700."

¶42.     Hickman then testified that Davis "proceeded to pull his money out. I guess he was going to get the gun or whatever, *and [Boyd] nodded his head to [Goodin], and [Goodin] pulled up his gun.* [Davis] ran towards him. That's when they got to fighting." (Emphasis added). Although Hickman testified that Goodin "just held [his gun] in his hand," Hickman also testified that "[Davis] rushed him [(Goodin)], *I guess he knew something was about to go on because he rushed him.* And when [Davis] rushed [Goodin], that's when they [(Boyd and Goodin)] started jumping on him . . . and they ended up out of the room fighting." (Emphasis added). Both Goodin and Hickman testified that they then saw Boyd shoot Davis. From these circumstances, we find that a rational juror could reasonably infer that Boyd (and Goodin) attempted to rob Davis in the course of the shooting.

¶43.     Regardless, there is sufficient evidence in the record from which a rational juror could find that Boyd robbed Davis.[8] Hickman testified that after Boyd shot Davis, Boyd "ran over there [to the body] and he started searching his [(Davis's)] pockets, pulling on him and stuff." Likewise, the motel surveillance video shows that after shooting Davis, Boyd went through Davis's pockets and was pulling on him. The surveillance video also shows that

---

[8] We observe that even if there was insufficient evidence that Boyd robbed Davis, "[i]n Mississippi both an attempt to take and an actual taking of another's personal property against his will by violence to his person or by putting such person in fear of immediate injury to his person by the exhibition of a deadly weapon constitutes robbery." *Clark v. State*, 343 So. 3d 943, 999 (¶270) (Miss. 2022), *cert. denied*, 143 S. Ct. 2406 (2023). Here, evidence supports that Boyd exhibited his handgun.

16

Boyd then starts picking things up off the ground near Davis's body for the remaining minute of the video. Additionally, in narrating the surveillance video that was played for the jury at trial, Detective Patillo confirmed that for the last minute or so of the video, Boyd, in a blue hoodie, can be seen picking items up near Davis's body.[9]

¶44. Although it is unclear in the video what Boyd picked up, we observe that Goodin testified that he picked up money outside the motel room "that flung out during the fight" and that "had to have been [Davis's]." Hickman testified that he picked up a twenty-dollar bill as he was leaving. He said there "was a lot more stuff on the ground," but he returned to his truck. We find that these circumstances, viewed as a whole, are sufficient evidence for a rational juror to reasonably find that Boyd robbed Davis.

### D. Conclusion Regarding Sufficiency of the Evidence

¶45. In light of the evidence described above and pursuant to the applicable standard of review, we find that sufficient evidence was presented at trial to support a jury's conviction of capital murder with the underlying felony of robbery. Accordingly, we find that Boyd's sufficiency-of-the-evidence assignment of error fails.

### II. Weight of the Evidence

¶46. Boyd asserts that for the same reasons he raised with respect to his sufficiency-of-the-evidence challenge, the jury's verdict is against the overwhelming weight of the evidence.

---

[9] Whether Davis was likely dead at this time does not matter. "[I]f the intervening time between the time of the murder and the time of taking of the property formed a continuous chain of events, the fact that the victim was dead when [the defendant] took the property cannot absolve the defendant from the crime of robbery." *Batiste*, 121 So. 3d at 832 (¶33). We find that these circumstances exist in this case.

In particular, Boyd asserts that the State failed to prove a necessary element of capital murder (the underlying robbery), and it was an abuse of discretion for the trial court to deny, by operation of law, his motion for a new trial. We disagree.

¶47. Based on the same evidence and testimony discussed above, we find that Boyd's challenge to the weight of the evidence is without merit. When considering a challenge to the weight of the evidence, our role "is to review the trial court's decision to grant or deny a new trial for an abuse of discretion." *Little v. State*, 233 So. 3d 288, 292 (¶21) (Miss. 2017). In doing so, the Court "weigh[s] the evidence in the light most favorable to the verdict, only disturbing a verdict when it is so contrary to the overwhelming weight of the evidence that to allow it to stand would sanction an unconscionable injustice." *Id.* Also, "the jury is the sole judge of the weight of the evidence and the credibility of the witnesses[, and] [c]onflicts in the evidence are for the jury to resolve." *Manyfield v. State*, 296 So. 3d 240, 252 (¶42) (Miss. Ct. App. 2020) (citation and internal quotation marks omitted).

¶48. Applying these principles here, and bearing in mind that it is the jury's role to weigh the evidence and make reasonable inferences, we find that allowing the verdict to stand in this case would not sanction an unconscionable injustice. We find no abuse of discretion in the trial court's denial, by operation of law, of Boyd's motion for a new trial.

## CONCLUSION

¶49. Because we find that Boyd's challenges to the sufficiency and the weight of the evidence fail, we affirm Boyd's conviction and sentence.

¶50. **AFFIRMED.**

**BARNES, C.J., WILSON, P.J., GREENLEE, WESTBROOKS, McDONALD, LAWRENCE, McCARTY, SMITH AND EMFINGER, JJ., CONCUR.**